# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **MICHAEL L. SCHLATTMAN**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 12 C 10422 |
| | ) |
| **CAROLYN W. COLVIN**, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Michael Schlattman ("Schlattman") seeks judicial review pursuant to the Social Security Act ("Act"), more specifically 42 U.S.C. §§ 405(g) and 1383(c)(3),[1] of the final decision by Commissioner of Social Security Michael Astrue ("Commissioner")[2] that denied Schlattman's claim for disability insurance benefits under Title II of the Act. Schlattman has moved to reverse Commissioner's decision and remand for further proceedings, and Commissioner has filed a cross-motion for summary judgment under Fed. R. Civ. P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Commissioner's motion is denied, Schlattman's motion is granted and the case is remanded for further proceedings consistent with this opinion.

---

[1] All further statutory references will take the form "Section --," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. § --." Finally, record references will be cited "R. --."

[2] Carolyn Colvin is now the Acting Commissioner, having replaced Commissioner Astrue. Fed. R. Civ. P. 25(d) provides for her automatic substitution as a party, and both the case caption and the text treat her as such (including attributing to her the final decision at the administrative level, even though it antedated her taking office).

**Procedural Background**

On August 5, 2009 Schlattman filed an application for disability insurance benefits, alleging an onset of disability on July 31, 2009 (R. 26). Those claims were initially denied on November 4, 2009, and Schlattman's request for reconsideration was denied on April 6, 2010 (id.). Schlattman then filed an April 14, 2010 request for a hearing, and Administrative Law Judge Nadine Overton ("ALJ Overton" or simply "the ALJ") held that hearing (the "Hearing") on April 11, 2011 (id.).

On July 14, 2011 ALJ Overton ruled that Schlattman was not disabled (1) because his impairments did not meet or medically equal any of the impairments listed in the regulations (R. 29) and (2) because those impairments did not prevent Schlattman from performing a significant number of jobs in the national economy (R. 40). Schlattman requested review by the Appeals Council, but his request was denied on October 25, 2012 (R. 7), rendering ALJ Overton's ruling the Commissioner's final decision (Reg. § 404.981). On December 28, 2012 Schlattman filed this action.

**General Background**

Schlattman, born on June 18, 1965, was 46 years old when ALJ Overton determined that he was not disabled (R. 172). He had been married to Kay McMahon ("Kay") since 1991 (id.). Schlattman has two children, Morgan and Michaela Schlattman, both of whom lived with him at the time of decision (R. 173).

Schlattman has a college education, having received a bachelor's degree in business administration from Eastern Michigan University (R. 57). From 1988 until 2009 Schlattman worked as a product manager for leasing companies and computer resalers (R. 233-38).

Schlattman asserts that since 2009 he has been unable to work due to depression, Attention Deficit Hyperactivity Disorder ("ADHD"), fatigue and (most significantly) short-term memory impairments resulting from normal pressure hydrocephalus[3] (R. 223).

**Medical Evidence**

As early as 2008 Schlattman began complaining of memory problems and continuing issues with his depression (R. 363). In June 2009 Dr. Gregory Trevino reported that Schlattman's symptoms -- poor balance and worsening memory -- raised the possibility of normal pressure hydrocephalus (R. 401-03). Further testing confirmed that hypothesis (R. 414, 462) and demonstrated degeneration of the lumbar spine (R. 441). To alleviate the symptoms of hydrocephalus, Schlattman was scheduled to have a brain shunt implanted by Dr. Thomas Origitano.

Dr. Origitano ordered Schlattman to receive neuropsychological testing before surgery (R. 510). Accordingly Dr. Dawn Kroencke performed baseline cognitive testing on Schlattman in August 2009, administering a variety of tests over the course of five hours (R. 482). Dr. Kroencke determined that Schlattman had average overall cognitive abilities and intelligence (id.) but that his memory was significantly below average: He scored in the 7th percentile in his

---

[3] As described in National Institute of Neurological Disorders and Stroke, *Normal Pressure Hydrocephalus Information Page*, http://www.ninds.nih.gov/disorders/normal_pressure_hydrocephalus/normal_pressure_hydrocephalus.htm (last visited Dec. 17, 2013):

> Normal pressure hydrocephalus (NPH) is an abnormal buildup of cerebrospinal fluid (CSF) in the brain's ventricles, or cavities. It occurs if the normal flow of CSF throughout the brain and spinal cord is blocked in some way. This causes the ventricles to enlarge, putting pressure on the brain . . . . Symptoms of NPH include progressive mental impairment and dementia, problems with walking, and impaired bladder control.

General Memory Index, in the 19th percentile in his Immediate Memory Index (R. 483) and in the 2d percentile in Auditory Recognition Delayed Index (R. 485). Dr. Kroencke ultimately diagnosed Schlattman with impaired memory and moderate emotional disturbance, both of which she believed were likely related to his normal pressure hydrocephalus (R. 486).

On September 11, 2009 Dr. Origitano surgically implanted a brain shunt as planned (R. 518). That shunt was later readjusted multiple times in an effort to alleviate Schlattman's symptoms (R. 555), but those symptoms -- including worsened nausea -- persisted (R. 519-40). Eventually the shunt was replaced entirely (R. 643-44).

On October 27, 2009 Dr. Carl Hermsmeyer reviewed the record for the Illinois Bureau of Disability Determination Services ("state agency") and found that Schlattman had mild limitation in activities of daily living, moderate difficulty in maintaining social functioning and moderate difficulty in maintaining concentration, persistence or pace (R. 597). Dr. Hermsmeyer opined that Schlattman had problems with understanding, remembering and carrying out detailed instructions, but that he retained "the mental capacity to perform simple one and two-step tasks at a consistent pace" (R. 603). Dr. Calixto Aquino, also reviewing the record for the state agency, found that Schlattman could only occasionally balance, should avoid climbing ladders, ropes or scaffolding and would have to avoid concentrated exposure to work hazards (R. 605-12). On reconsideration Drs. Francis Vincent and Russell Taylor affirmed the conclusions of Drs. Hermsmeyer and Aquino (R. 627-29).

Schlattman also underwent sleep testing, which found evidence of hypersomnia (possibly relating to his hydrocephalus) and raised the possibility of using wake-promoting agents (R. 654).

Throughout the period following his various surgeries Schlattman continued to complain of memory problems (R. 518-702).

On May 13 and14, 2010 Dr. Kroencke again examined Schlattman's cognitive abilities (R. 720-21). In her June 3, 2010 report on that examination Dr. Kroencke documented Schlattman's continuing declines in verbal and memory abilities (R. 736-45). She found that Schlattman's Verbal Comprehension Index -- measuring his ability to solve verbal problems and use knowledge acquired throughout his lifetime -- had declined to a statistically significantly degree since the shunt implantation (R. 738). Dr. Kroencke also found "[d]rastic changes in memory capacity from pre-surgery testing . . . showing an overall striking decline in memory ability" (R. 740). According to test results obtained using the Wechsler Memory Scale-IV, Schlattman's scores in the Immediate Memory Index and Delayed Memory Index placed him in the 7th and 3d percentile ranks respectively (id.). Those results place Schlattman clearly in the "borderline" range, but Schlattman's visual memory (although having declined significantly since his pre-operation testing) was more robust and was assessed as being in the "low average" range (id.).

Ultimately Dr. Kroencke found that while Schlattman's overall cognitive abilities were strong (with "average" performances on the COGNISTAT examination and a Full Scale IQ of 102), Schlattman's memory abilities ranged from low average to borderline (R. 741). Dr. Kroencke also administered the Conners' Continuous Performance Test II and determined that there is a 99.9% chance that Schlattman suffers from a clinical attention deficit (R. 743). She noted that Schlattman's overall cognitive status was in the Average range for all domains

except that of memory (R. 743) -- a domain in which he experienced severe impairment. Finally she assessed his GAF[4] score as 51-60 (R. 744).

Based on those results Dr. Kroencke diagnosed Schlattman with cognitive disorder-NOS and ADHD (id.). She found that Schlattman was likely to experience difficulties in novel, complex or changing situations but that it was important for him to continue to keep mentally and physically active by doing activities such as puzzles (id.).

In a medical source statement prepared for the Social Security Administration on June 14, 2010, Dr. Kroencke stated that Schlattman had "severe impairment with respect to memory function" and "significant decline" in verbal ability (R. 734). She rated Schlattman as "poor or none" in these eight categories of aptitude for unskilled work: remembering work-like procedures; understanding and remembering very short and simple instructions; maintaining attention for two-hour segments; sustaining an ordinary routine without special supervision; performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; dealing with normal work stress; and being aware of hazards (id.). She rated Schlattman's ability to carry out short and simple

---

[4] Global Assessment of Functioning (GAF) rates a "clinician's judgment of the individual's overall level of functioning" on a scale of 0 to 100. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 32-34 (4th ed. text revision 2000). GAF scores of 51-60 indicate moderate symptoms or limitations in social, occupation or school function (id. at 34). As Bates v. Colvin, 736 F.3d 1093, 1099 n.3 (7th Cir. 2013) recently explained:

> The GAF score reflects both severity of symptoms and functional level. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000) . . . . While the American Psychiatric Association has since discontinued this metric, Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013), the GAF score was still in use at the time [of examination].

instructions as "fair" and his ability to carry out detailed instructions as "good" if the instructions were written (id. at 734-35). Dr. Kroencke also noted that Schlattman's memory had declined to a statistically significant extent from his pre-surgery baseline testing (id. at 735).

On October 10, 2010 another state agency mental health consultant, Dr. David Biscardi, reviewed Schlattman's medical history (including Dr. Kroencke's examinations) and assessed Schlattman's work-related capacities (R. 747-58). Dr. Biscardi opined that Schlattman had "mild" or "moderate" limitations in a variety of domains, including the ability to carry out simple instructions, understand and remember simple instructions and make judgments on complex work-related decisions (R. 748). Dr. Biscardi also concluded that Schlattman would have moderate difficulties in maintaining concentration, persistence or pace (R. 754). He rejected claims of marketed limitations in function as "not supported by the objective evidence" and affirmed the DDS assessment that Schlattman was capable of performing "simple routine competitive work activities" (R. 758).

Schlattman continued to report cognitive difficulties, and his ventricles had not diminished in size (R. 814, 820), so he was admitted to the hospital to undergo right frontal intracranial pressure monitor placement (R. 805). That procedure showed that the shunt had not been malfunctioning and Schlattman was accordingly discharged (id.). Physically Schlattman has few constraints: He has reported that he is able to work out on a stationary bike for 30 minutes each day and remains very active (id.).

## Hearing Testimony

Schlattman, his wife and Vocational Expert Aimee Mowery ("VE Mowery") testified at the Hearing. Schlattman testified that he was able to do limited housework, watch television and

play solitaire on his computer (R. 53-61), but he has not worked for money since 2009 (R. 58). On "good days" he will do laundry, cook, vacuum and occasionally mow the lawn (R. 61, 64), whereas on "bad days" he primarily remains in bed. Schlattman testified that he has approximately two bad days each week, during which he is unable to engage in almost any activity (R. 66-68).

Schlattman also stated that he cared for his special needs daughter, who suffers from a rare developmental disorder that prevents her from speaking and includes autistic tendencies (R. 55, 78). Each day he dresses his daughter, makes her breakfast and takes her to the school bus (R. 60-61). He also picks her up from the bus at the end of the school day, though he requires a phone alarm to remind him to do so (R. 63).

Schlattman's wife essentially confirmed her husband's account, testifying that Schlattman takes significant time to start tasks and is easily distracted from completing them (R. 73). She stated that Schlattman's "bad days" occurred quite frequently, as often as half the days in a given month (R. 75). She also stated that she called Schlattman frequently to ensure that he remembered to prepare their daughter for school and meet her at the school bus (R. 76) and that he had missed the bus "a couple times" (R. 78).

Finally the ALJ heard testimony from VE Mowery. ALJ Overton asked VE Mowery whether a hypothetical individual with Schlattman's age, education and past work experience could perform work in the economy if he (1) could never climb ropes, scaffolds or ladders, (2) should not do jobs with more than an occasional need for balance, (3) should avoid concentrated exposure to moving machinery and unprotected heights and (4) should be limited to occupations that do not require complex written or verbal communications (R. 84-85). ALJ

Overton added that the work should be limited to simple, routine and repetitive tasks in a low-stress environment involving only occasional decisionmaking, occasional changes in the work setting and occasional interactions with the public (R. 85). VE Mowery testified that while an individual of that description could not perform Schlattman's past work, he could work as a hand packager (SVP level 2), a food prep work (SVP level 2) and a cleaner (SVP level 2) -- jobs that numbered a total of some 18,500 in the regional economy (R. 84-85).

Next the ALJ asked VE Mowery whether a further limitation to a work environment free of fast-paced production requirement would eliminate any of those jobs. VE Mowery answered that the number of hand packager position would be reduced by 50 percent (R. 86). VE Mowery also testified that the typical employer tolerance for absence is one day or less each month, and the same is true for lateness and tardiness (R. 86). And employers will not tolerate an employee who is off task for more than 15 percent of the day (R. 87).

Schlattman's attorney also examined VE Mowery and asked how her testimony would be affected if the full list of restrictions from Dr. Kroenke's functional capacity opinion were included, such that an individual had "poor to none" mental ability aptitude in (1) responding appropriately to changes in work setting, (2) dealing with normal work stress and (3) being aware of hazards and taking appropriate precautions. VE Mowery testified that those added limitations would eliminate all occupations (R. 88).

**ALJ Decision**

After considering the record ALJ Overton made a series of findings. What follows, though an abbreviated paraphrase, is faithful to the original:

1. Schlattman met the insured status requirements through December 31, 2013 (R. 28).

2. Schlattman has not engaged in substantial gainful activity since July 31, 2009 (id.).

3. Schlattman has the following severe impairments: hydrocephalus, memory loss, depression and ADHD (Reg. §404.1520(c)) (id.).

4. Those impairments do not meet or medically equal one of the impairments listed in Reg. §§404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926 (R. 29). Schlattman's difficulties in concentration, persistence and pace were moderate rather than marked (R. 30).

5. Schlattman's residual functional capacity ("RFC") includes the ability to perform a full range of work at all exertion levels (R. 31). Schlattman is limited by the need to avoid concentrated exposure to heavy moving machinery, unprotected heights and all hazardous machinery. He is also limited to work with simple, routine, repetitive tasks in a low stress job (defined as having no more than occasional decisionmaking and occasional changes in work setting). No occupation should require complex written or oral communications, and Schlattman should have no more than occasional interaction with the public (id.).

6. Schlattman is unable to perform any past relevant work (R. 39).

7. Considering Schlattman's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Schlattman can perform (R. 40).

8. Schlattman has not been under a disability from July 31, 2009 through the date of the decision (R. 41).

**Standard of Review and Applicable Law**

This Court reviews the ALJ's decision as Commissioner's final decision, reviewing the legal conclusions de novo (Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005)). By contrast, factual determinations receive deferential review, and courts may therefore not "reweigh the evidence or substitute [their] own judgment for that of the ALJ" and will affirm Commissioner's decision "if it is supported by substantial evidence" (id.). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks and citations omitted)).

As cases such as Haynes, 416 F.3d at 626 (internal quotation marks and citation omitted) teach:

> In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion. The ALJ need not, however, provide a complete written evaluation of every piece of testimony and evidence.

Hence "[i]f the Commissioner's decision lacks adequate discussion of the issues, it will be remanded" (Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009)). Reversal is also required if the ALJ has committed an error of law, regardless of how much evidence supports his or her factual findings (see Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997)).

To qualify for benefits a claimant must be "disabled" within the meaning of the Act (Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir. 2009), citing Section 423(a)(1)(E)). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" (Section 423(d)(1)(A)). Claimants must also demonstrate that the disability arose during the period for which they were insured (Section 423(a)(1)(A) and (c)(1)).

Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995) sets out the customary five-step inquiry prescribed by Reg. § 404.1520(a)(4) for determining whether a claimant is disabled:

> (1) whether the claimant is currently employed;
>
> (2) whether the claimant has a severe impairment;
>
> (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Act], see 20 C.F.R. § 404, Subpt. P, App. 1;
>
> (4) whether the claimant can perform [his] past work; and
>
> (5) whether the claimant is capable of performing work in the national economy.

In addition to being "under a disability," one must also meet the insured-status requirements outlined in Section 416(i)(3) to receive disability benefits. In essence that means Schlattman must show he was under a disability before his insured status expired (Reg. § 404.131(a); Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011)).

**Affirm, Reverse or Remand?**

Schlattman advances a number of arguments to support his motion to reverse or remand the Commissioner's decision. Thus he contends that the ALJ (1) wrongly failed to include a

limitation to one- and two-step tasks in her RFC finding and in her hypothetical question to the vocational expert, (2) gave too little weight to the treating opinion of Dr. Kroencke, (3) failed to understand the nature of Schlattman's memory disorder (not least by failing to grasp the impact of Schlattman's claimed "bad days," during which he was unable to leave the bed), (4) failed to accommodate properly Schlattman's limitations in concentration and persistence and (5) committed a host of miscellaneous sins, including a failure to consider the credibility factors set forth in Social Security Ruling ("SSR") 96-7p and an improper reliance on Schlattman's daily activities.

Failure To Include One- to Two-Step Limitation

First (and most substantially) Schlattman argues that the ALJ failed to include a limitation to one- and two-step tasks in her RFC finding and to include a one- to two-step task limitation in her questions posed to VE Mowery. Schlattman notes that the opinion of agency consultant Dr. Hermsmeyer (to which the ALJ gave a "good amount of weight" and found to be consistent with the medical evidence of record) included a finding that Schlattman "was capable of performing simple one and two step tasks at a consistent pace" (R. 30). ALJ Overton specifically mentioned Dr. Hermsmeyer's one- to two-step finding and also noted that "[a]nother state agency mental health consultant [Dr. Russell Taylor] later affirmed this opinion" (id.).

But ALJ Overton did not ultimately limit Schlattman to one- and two-step tasks in her RFC finding (R. 31). Nor did ALJ Overton include a one- to two-step limitation in her hypothetical question to VE Mowery. In fact ALJ Overton never mentioned the one- to two-step limitation again, either to include it in her findings or to reject its applicability. Instead ALJ Overton limited Schlattman to "simple, routine, repetitive tasks" (R. 31).

- 13 -

Although neither party discusses the issue in detail, there is a significant difference between one- to two-step tasks and simple, routine, repetitive tasks. One- to two-step tasks function as a term of art in the Social Security context: Thus the Department of Labor's Dictionary of Occupational Titles ("DOT") defines a Reasoning Development Level of 1 as the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" (1991 WL 688702). As Wiszowaty v. Astrue, 861 F. Supp. 2d 924, 947 (N.D. Ind. 2012) recently noted, collecting cases:

> Although the Seventh Circuit has not addressed the issue, several courts, including this Court recently, have concluded that a limitation to one- to two-step tasks is consistent with GED Reasoning Development Level 1.

What little appellate caselaw exists tends to support that understanding (see, e.g. Segura v. Barnhart, 148 F. App'x 707, 711 (10th Cir. 2005)).

By contrast, Reasoning Development Level 2 requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" (DOT, 1991 WL 688702). And the three occupations cited by VE Mowery all require a Reasoning Development Level of 2 (see R. 40; DOT 920.687-134, 317.664-010, 323.687-018). Thus if Dr. Hermsmeyer's one- to two-step limitation had been credited and included as part of ALJ Overton's hypothetical question to the vocational expert, it would have eliminated all occupations cited by VE Mowery and called into question the ALJ's finding that Schlattman could perform a significant number of jobs in the national economy.[5]

---

[5] Commissioner fails to respond substantively to Schlattman on this point, citing instead a number of cases concerning whether an ALJ should have recognized an inconsistency between a VE's testimony and the DOT. But those cases -- which deal with situations in which an ALJ properly gave a one- to two-step limitation, while the VE's response effectively disregarded that
(continued...)

As Schlattman notes, ALJ Overton never explained her reason for disregarding Dr. Hermsmeyer's proposed limitation to one- to two-step tasks. That omission is closely akin to the ALJ's error in Kasarsky v. Barnhart, 335 F.3d 539, 544 (7th Cir. 2002) (per curiam), which also dealt with a failure to include a functional limitation in questions to a vocational expert:

> We see nothing in this description, however, that takes into account the ALJ's own earlier observation (both in his opinion and in the PRTF) that Kasarsky suffered from frequent deficiencies of concentration, persistence, or pace. It is possible, of course, that there is an explanation for this omission. Perhaps the ALJ thought that even with frequent deficiencies of this type, Kasarsky could still carry out detailed instructions in a way that would satisfy a potential employer. But we have no way of knowing that, and it is equally possible that Verkins might have found that there were no jobs for someone with (a) limited exertional abilities, (b) borderline intelligence, and (c) frequent deficiencies of concentration, persistence or pace. Employers are entitled to demand that their employees stick with the job, once they have been trained to do it; the length of time it takes someone with borderline intelligence to learn a job is not the same as the ability of that person to perform consistently once trained. The ALJ's failure to incorporate the latter kind of limitation, fully supported by this record, in the hypotheticals he posed to the vocational expert requires us to remand this case for further proceedings.

Here too it is possible that the ALJ may have consciously chosen to omit the one- to two-step limitation, looking to the language employed by Dr. Biscardi rather than the opinions of Drs. Hermsmeyer and Taylor. But there is no language in the ALJ's opinion to that effect and therefore no "logical bridge" (Haynes, 416 F.3d at 626) that allows this Court to determine whether the failure to include the limitation was a conscious decision or a lapse in judgment. In the absence of any logical bridge this Court must remand for further proceedings.

---

[5](...continued)
limitation -- are inapposite in a case such as this one, in which the ALJ failed entirely to give a one- to two-step limitation.

One other potential objection should be addressed at this juncture. Commissioner might argue that the ALJ need not consider Dr. Hermsmeyer's opinion regarding the one- to two-step limitation because the Commissioner (rather than medical experts) has the authority to decide Schlattman's ability to work. But our Court of Appeals' recent decision in Roddy v. Astrue, 705 F.3d 631, 638 (7th Cir. 2013) teaches otherwise:

> As a final note, the Commissioner might have (but did not) argue that Dr. Wright's opinion concerning Roddy's ability to work was not the kind of "medical opinion" that the ALJ must evaluate under 20 C.F.R. § 404.1527(b), c. The agency's regulations assign the decision about ability to work to the Commissioner. See 20 C.F.R. § 404.1527(d)(1); Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir.2002); Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). But it is just as well that the Commissioner is not defending the decision on that ground. Even if Dr. Wright's opinion of Roddy's ability to work is not a "medical opinion" under the regulatory checklist, that does not mean that the ALJ should have ignored that statement. Bjornson, 671 F.3d at 647; Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008). Although the ALJ does "not give any special significance" to such opinions, he still must consider "opinions from medical sources" in determining the claimant's residual functional capacity. 20 C.F.R. § 404.1527(d)(2)–(3); Bjornson, 671 F.3d at 647–48; Barnett, 381 F.3d at 669.

Even more recently Garcia v. Colvin, No. 13-2120, 2013 WL 6698045, at *2 (7th Cir. Dec. 20, 2013) has also emphasized that while the question "whether the applicant is sufficiently disabled to qualify for social security benefits is a question of law," the answer to that question "depends on the applicant's physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored."

<u>Use of Daily Activities</u>

Because the just-completed discussion independently warrants remand, this opinion will not expend even more words treating Schlattman's other arguments at length.[6] One troubling

---

[6] This should not be mistaken as discounting those other arguments, several of which
(continued...)

issue, however, merits special attention. Schlattman argues that ALJ Overton erred in weighing Dr. Kroencke's treating opinion -- particularly by giving "little weight" to Dr. Kroencke's June 14, 2010 opinion (R. 38). As the ALJ recognized, SSR 96-2 requires her to give Dr. Kroencke's opinion as a treating psychologist controlling weight if that opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record (SSR 96-2p). In not so crediting Dr. Kroencke's opinion, ALJ Overton found it inconsistent with Schlattman's daily activities -- particularly his care for his special needs daughter (R. 38).

That reliance on Schlattman's ability to perform some limited activities to care for his special needs daughter is particularly bothersome. As <u>Roddy</u>, 705 F.3d at 639 said just last year:

> We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time.

And Schlattman's ability to perform such limited functions as preparing his daughter for school, getting her to her bus and picking her up from the bus station simply cannot be translated into an ability to function in a workplace environment. Indeed, <u>Bjornson v. Astrue</u>, 671 F.3d 640, 647 (7th Cir. 2012) (citing cases) has bemoaned the stubborn tendency of the Commissioner to equate the activities of daily living with those of gainful employment:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (in this case, Bjornson's husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent,

---

[6](...continued)
have significant force. Instead the ALJ assigned to the case on remand should give careful consideration to each of Schlattman's contentions.

and deplorable, feature of opinions by administrative law judges in social security disability cases.

To compound that deficiency, the ALJ also failed to take into account Schlattman's limitations in caring for his daughter. Both Schlattman and his wife testified that he required reminders (either by alarm or phone) to prepare his daughter for school, that their daughter was herself very time-sensitive and helped to ensure that she was ready on schedule and that Schlattman had occasionally failed to complete those activities in time. It is well established that "[a]n ALJ cannot disregard a claimaint's limitations in performing household activities" (Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009)), but the ALJ nowhere mentions such limitations in her discussion of Dr. Kroencke's opinion (though they are cursorily mentioned elsewhere (R. 37)).

In sum, the level of Schlattman's ability to care for his daughter certainly does not constitute the sort of "good reasons" that an ALJ must offer in discounting the opinion of a treating physician (Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011)).[7] That and the other deficiencies just referred to in n.6 -- the "deplorable" conflation of private domestic activity and

---

[7] ALJ Overton's inappropriate reliance on household activities persists in other portions of her decision. In assessing Schlattman's claims of inability to work, the ALJ reviewed Schlattman's ability to do the following activities: "laundry; household chores; some cooking; mows lawn; occasionally attends and drives daughter to softball games; uses computer for Solitaire games, emails and reading news; watches sports; and programs the DVR" (R. 37). From that the ALJ sought to conclude that those "extensive activities are inconsistent with claimant and his wife's reported good and bad days monthly" (id.). But that conclusion simply does not follow. Schlattman's ability to occasionally mow his lawn or even drive a car says nothing at all regarding how often he has a "bad day" and remains confined to bed. Worse, the ALJ explicitly relies on Schlattman's care for his daughter in discrediting his limitations: "The claimant reported that he is responsible on a daily basis for his special needs daughter. This responsibility alone supports adequate cognitive abilities" (id.) (emphasis added). But that is precisely the sort of "deplorable" failure to recognize the distinction between work and home life repeatedly criticized by our Court of Appeals.

gainful employment -- would also appear to justify remand on their own, though that need not be decided given the analysis and conclusion the preceding section of this opinion.

**Conclusion**

Although what has been said here does not require reversal, it certainly calls for remand. And although the decision as to assignment of the case on remand is for the Commissioner to make, in light of the matters discussed in this opinion this Court recommends that the Commissioner give consideration to assigning the case on remand to a different ALJ (see, e.g., Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996), delivering a message given frequently since then by our Court of Appeals). Commissioner's cross-motion is of course denied.

_____
Milton I. Shadur
Senior United States District Judge

Date: January 14, 2014